UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                    )
                                    )
SHANNON REYNOLDS,                   )
                                    )
            Plaintiff,              )
                                    )
    v.                              )
                                    )   Civil Action No. 13-cv-10117-DJC
                                    )
BUTLER HOSPITAL et al.,             )
                                    )
            Defendants.             )
                                    )
                                    )
_____)

## MEMORANDUM AND ORDER

CASPER, J.                                                                  May 4, 2015

### I.  Introduction

Plaintiff Shannon Reynolds ("Plaintiff") has filed this lawsuit against Defendants Butler Hospital ("Butler") and Care New England Health System (collectively, "Defendants") alleging a violation of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12117.  D. 1. Defendants have moved for summary judgment.  D. 60.  For the reasons stated below, the Court DENIES the motion.

### II.  Standard of Review

The Court grants summary judgment where there is no genuine dispute as to any material fact and the undisputed facts demonstrate that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  "A fact is material if it carries with it the potential to affect the outcome of the suit under applicable law."  Santiago–Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000) (quoting Sánchez v. Alvarado, 101 F.3d 223, 227 (1st Cir.

1

1996)). The movant bears the burden of demonstrating the absence of a genuine issue of material fact. Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir. 2000); see Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the movant meets its burden, the non-moving party may not rest on the allegations or denials in its pleadings, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986), but must come forward with specific admissible facts showing that there is a genuine issue for trial. Borges ex rel. S.M.B.W. v. Serrano–Isern, 605 F.3d 1, 5 (1st Cir. 2010). The Court "view[s] the record in the light most favorable to the nonmovant, drawing reasonable inferences in [her] favor." Noonan v. Staples, Inc., 556 F.3d 20, 25 (1st Cir. 2009) (citation omitted).

## III. Factual Background

The following facts are as stated in Reynolds' Statement of Material Facts, D. 75, and, where undisputed, Defendants' Statement of Facts, D. 62. Butler is a private, nonprofit, psychiatric and substance abuse hospital in Rhode Island. D. 62 ¶ 1. Care New England Health System is Butler's sole corporate member. Id. ¶ 2. Butler provides care for a wide range of patients, including those with violent tendencies and hallucinations. Id. ¶ 1. Butler regularly admits patients who attempt self-harm and suicide. Id.

Reynolds is a 35-year-old with a Bachelor of Arts and Master's Degree in Expressive Art Therapies. D. 75 ¶¶ 1, 2.[1] Reynolds has hearing and vision limitations for which she receives regular medical care. Id. ¶ 4. Reynolds uses hearing aids that correct her hearing to the level of a person with no hearing loss. Id. ¶ 5. Reynolds' vision impairment affects her everyday life. Id. ¶ 6. Reynolds suffers from a retinal condition called "myopic degeneration" and has vision

---

[1] Unless otherwise noted, all citations to D. 75 refer to Plaintiff's Statement of Material Facts (beginning on page 12). The first section of the document (pp. 1-12) contains Plaintiff's Responses to Defendants' Statement of Facts.

2

on the borderline of legal blindness. D. 62 ¶¶ 63-64. She is unable to drive, but can see and read with the use of contact lenses and glasses. D. 75 ¶ 6. Reynolds testified that, using her contacts and glasses to correct her vision, she is able to see at 20 inches or less and recognize faces at distances of 20 feet or more. D. 75-4 at 24-25.

On June 8, 2011, Reynolds applied for a job with Butler as an Activities Therapist/Mental Health Worker Float ("Therapist"). D. 62 ¶ 4; D. 75-4 at 9. Among other duties, a Therapist "[i]nsures a safe and therapeutic environment on the unit through observation, monitoring, interacting and providing groups" for patients admitted to Butler. D. 62-3 at 5. The job description further provided that a Therapist must "[m]onitor[] patients [sic] behaviors and needs and report[] activities to the nurse" and "[r]ecord[] patient observations appropriately on the checks form and [be] diligent about following the observation procedure." Id. A Therapist must also "[c]onsistently consider[] [her] own safety, [and the] safety of other staff and patients on the unit in the execution of patient care" and "[d]emonstrate[] ability to maintain a safe and therapeutic environment." Id. The job description contained both vision and hearing requirements: a Therapist must have "[c]lose vision (20 inches or less)" and "[d]istant vision (20 feet or more)" and must be able to "hear alarms/equipment," "hear patient call[s]" and "hear instructions from department staff." Id. at 7.

After interviews with Barbara Ostrove, Butler's Director of Occupational Therapy, and Richard Johnson, Director of Nursing Operations, Ostrove offered Reynolds the Therapist job. D. 62 ¶¶ 5-6. After speaking with Johnson about the job duties, Reynolds had no concerns about her vision or hearing affecting her ability to perform the job. D. 75 ¶ 9. Reynolds was medically cleared for work by a Butler nurse. Id. ¶ 10; D. 75-1 at 9.

Reynolds began work on July 26, 2011. D. 62 ¶ 7. During training, she reported to Patrick Camp, a union representative, that she had vision limitations and would need to hold the "checks board"[2] close to her face. D. 75 ¶ 12. She asked Camp to advise her if there were concerns regarding her vision limitations. Id. She also told Judy Sheehan, Butler's director of nursing, that she had vision limitations and needed to use the magnifier function on the computer for Microsoft Windows and Word. Id. ¶ 13.

After Sheehan told Ostrove of Reynolds' vision impairment, Ostrove met with Reynolds to discuss the physical requirements of the Therapist job. Id. ¶ 15. Reynolds stated that she was capable of meeting the job requirements, but needed to use the computer magnifier function to compensate for her vision impairment. D. 75-1 at 9. During this meeting, Ostrove asked Reynolds to identify a person in the hallway and Reynolds correctly identified the person. D. 75-4 at 13. Ostrove did not raise any concerns about Reynolds' ability to perform the responsibilities set forth in the job description. Id.

On October 9, 2011, there was an incident with a patient that caused Reynolds' co-workers to report concerns about Reynolds' vision. D. 75 ¶ 21. As Reynolds described the incident, a suicidal patient asked her to provide a safety razor so the patient could take a shower and shave. D. 75-4 at 16. Reynolds refused, but another nurse gave the patient a razor. Id. After her shower, the patient backed into a corner of the bathroom, covered her hand with her arm and told Reynolds she had cut herself. Id. at 16-17; D. 75-1 at 17. Reynolds called for Nurse Katelyn Donahue, the nurse assigned to the patient, and then Reynolds responded to the

---

[2] The checks board is a legal-sized sheet of paper on which Therapists make checkmarks next to patients' names to indicate the patients' status. D. 62-4 (sample checks board); D. 75-1 at 22.

patient. D. 75-1 at 18; D. 75-4 at 16-17. As a result of this incident, Donahue raised concerns to Butler management about Reynolds' ability to perform her job safely. D. 62 ¶ 44.

Shortly thereafter, Reynolds met with Ostrove, Tim Bigelow of Human Resources and Nurse Flannigan to discuss the incident. D. 75 ¶ 22. Bigelow stated that based on Reynolds' description of what happened, Reynolds should not have done anything differently. D. 75-4 at 19. At this meeting, however, Defendants raised concerns about Reynolds' checks board duties. D. 75 ¶ 24. Reynolds informed the group that she could see the checks board, but it was difficult. She said that it would help her if the lines on the checks board were made bold or a grayscale (monochromatic shading to make the borders of boxes clearer) were implemented. Id.

After this meeting, Reynolds was called to another meeting, this time with Ostrove, Bigelow and Camp (the union representative), to discuss her errors with the checks board. Id. ¶ 26. Reynolds had written "DC" – the code for discharge – next to the wrong patient on the checks board. D. 75-4 at 21. Reynolds again asked that the lines on the checks board be made bold or a grayscale be implemented. D. 75 ¶ 26. Despite Ostrove's positive response to this suggestion, id., the checks board was never modified, id. ¶ 30.

In early November 2011, Ostrove conducted Reynolds' 90-day job performance review. Id. ¶ 32. The performance review form, D. 75-9, included a recitation of the vision and hearing requirements of the job description. Id. at 7. Ostrove gave Reynolds a "Meets Standards" rating on her overall job performance. Id. at 8. Ostrove gave Reynolds a "Meets Standards" rating for all individual job responsibilities except one: the responsibility to "insure[] a safe and therapeutic environment on the unit through observation monitoring, interacting and providing groups." Id. at 5. For this job responsibility, Ostrove gave Reynolds a "Needs Improvement"

5

rating and noted in the comments section that Reynolds had made errors with the checks board and that "this [matter] was reviewed with her and strategies to compensate were discussed." Id.

On November 22, 2011, Ostrove met again with Reynolds. D. 75 ¶ 38. At this meeting, Ostrove told Reynolds that she had received a report of an incident in which Reynolds had failed to respond to a co-worker calling her name while Reynolds was conducting a bedside observation of a sleeping patient. Id. Reynolds did not recall the incident, but told Ostrove that she had an appointment that week to have her hearing aids checked and adjusted. Id. Ostrove told Reynolds of various complaints that had been made by her co-workers about Reynolds' responsiveness to patients and other Butler staff. D. 75-4 at 28. Bigelow then joined the meeting, and Ostrove and Bigelow terminated Reynolds' employment. Id. at 28-29.

Defendants offered Reynolds a position as a per diem Therapist in the Partial Hospital Program until she found another job. D. 75 ¶ 46. This job had the same job description as the Therapist job from which Reynolds was fired. Id.; D. 75-12 at 17-18. Reynolds trained for this position, but was never called to work a shift. D. 75 ¶ 47.

On January 24, 2012, Reynolds contacted Ostrove to inform her that she had taken a new job elsewhere. D. 62 ¶ 62.

## IV. Procedural History

Plaintiff instituted this action on January 18, 2013. D. 1. Defendants have now moved for summary judgment. D. 60. The Court heard the parties on the pending motion and took this matter under advisement. D. 81.

## V. Discussion

### A. Legal Framework

Title I of the ADA prohibits covered entities from "discriminat[ing] against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Reynolds alleges that Defendants discriminated against her on the basis of disability when they discharged her. This case is governed by the burden-shifting framework of McDonnell Douglas v. Green, 411 U.S. 792, 802-805 (1973). To make a *prima facie* showing of disability discrimination, Reynolds must show by a preponderance of the evidence: (1) that she was disabled within the meaning of the ADA; (2) that, with or without reasonable accommodation, she was qualified for her position; and (3) that Defendants discharged her because of her disability. García–Ayala v. Lederle Parenterals, Inc., 212 F.3d 638, 646 (1st Cir. 2000).

Defendants move for summary judgment solely on the grounds that Reynolds was not qualified for her position as a Therapist. To establish that she was qualified, Reynolds must demonstrate, first, that she had the necessary "skill, experience, education, and other job-related requirements" for the position and, second, that she was able to perform the "essential functions" of the position "with or without reasonable accommodation." Mulloy v. Acushnet Co., 460 F.3d 141, 147 (1st Cir. 2006) (quoting García–Ayala, 212 F.3d at 646). Defendants do not argue that Reynolds lacks the basic skill, experience, and education for the Therapist position. Defendants' sole contention is that Reynolds could not perform the essential functions of Therapist with or without reasonable accommodation and was not, therefore, a "qualified person" under the ADA.

B. **Essential Function**

An essential function is one that is "fundamental" to a position rather than "marginal." Kvorjak v. Maine, 259 F.3d 48, 55 (1st Cir. 2001). The ADA provides that "consideration shall

7

be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." 42 U.S.C. § 12111(8). Defendants submit that the essential functions of the Therapist position include "the ability to see clearly, both close vision and distance vision, and including the ability to recognize patients, staff members and others" and "the ability to hear satisfactorily, including the ability to hear patient requests and staff instructions." D. 61 at 7. The Court agrees that these vision and hearing functions are fundamental to a Therapist's responsibilities of monitoring and providing care for psychiatric and substance abuse patients. Indeed, Reynolds does not dispute that these vision and hearing requirements are essential functions of the Therapist position. Instead, Reynolds argues that she was able to perform these essential functions. D. 74 at 13-16.

### C. Ability to Perform With or Without Accommodation

The employee bears the burden of showing that she can perform the essential functions of the job with or without reasonable accommodation. See EEOC v. Amego, Inc., 110 F.3d 135, 141 (1st Cir. 1997). Furthermore, where essential job functions implicate the safety of others, the employee must demonstrate that she can perform those functions in a manner that will not endanger others. Amego, 110 F.3d at 144 (affirming summary judgment for employer on issue of qualification where depressed and suicidal plaintiff working at a residential facility for severely disabled people failed to show she could manage medication-related functions of her job without endangering others). The hearing and vision requirements for a Therapist responsible for monitoring patients at a psychiatric and substance abuse hospital like Butler plainly implicate the safety of others, so Reynolds must meet the Amego standard.

*i) Hearing*

8

In response to Defendants' motion, Reynolds has presented specific, admissible evidence that she was able to meet the hearing requirements of the Therapist position. Reynolds testified that she uses hearing aids that correct her hearing to the point of someone with no hearing loss. D. 75 ¶ 5. Dr. Konstantina Stankovic testified that anyone with hearing loss has difficulties in a noisy background, but noted that Reynolds is a good candidate for hearing aids and has moderate hearing loss. D. 75-8 at 3-5. After her termination, Reynolds went to her doctor to have her hearing aid corrected and her hearing returned to normal. D. 75-4 at 30.

The primary evidence cited by Defendants as to Reynolds' hearing limitation pertains to a November 2011 incident that immediately preceded Reynolds' termination. This incident – in which Reynolds allegedly failed to respond to a colleague calling her name while Reynolds was observing a patient – is described only through evidence that Reynolds has moved to strike from the record as inadmissible hearsay. D. 72. Defendants cite to Ostrove's deposition testimony, in which (1) Ostrove says that (2) Johnson told her that (3) Nurse Ben Candelaria told him that (4) an unnamed staff member reported to him that Reynolds had failed to respond when the unnamed staff member called her name. D. 62-15 at 4. Candelaria makes no mention of this incident in his affidavit. D. 62-13. Ostrove's account of this event plainly includes multiple levels of hearsay and cannot be admitted as substantive evidence of Reynolds' hearing limitations.[3]

---

[3] Whether, however, such testimony would be admissible for the limited non-hearsay purpose of showing at trial, after burden-shifting, whether Butler had a legitimate, non-discriminatory motivation or whether its stated reasons were pretext for discrimination, the Court will leave for determination at trial where the Defendants' present motion is addressed to whether Reynolds has even satisfied her *prima facie* showing. See Morgan v. Mass. Gen. Hosp., 712 F. Supp. 242, 245 n.1 (D. Mass. 1989) (denying motion to strike defendant's affidavits on hearsay grounds because "the alleged hearsay statements are not being used for the truth of the matter asserted, but rather are intended to show what was told to those people responsible for discharging plaintiff and, accordingly, what went into their decision" where the defendants

The only other evidence cited by Defendants as to Reynolds' hearing limitations negatively affecting her job performance are affidavits from Reynolds' co-workers stating that they observed that Reynolds had trouble hearing them when they spoke. D. 62-8 ¶ 6; D. 62-10 ¶ 9; D. 62-13 ¶ 9. Drawing all inferences in Reynolds' favor and crediting Reynolds' testimony that she can fully remediate her hearing loss with timely adjustments of her hearing aids, the Court finds that the Defendants have not established that Reynolds is unable to perform the essential hearing requirements of the Therapist job.

*ii)* *Vision*

The Court has also considered whether Reynolds has raised a triable issue of fact as to whether she was qualified to perform the vision functions of her job without accommodation and whether there was a reasonable accommodation that would have permitted her to perform the vision functions in question.

    a. <u>Ability to Perform Without Accommodation</u>

Reynolds has presented some evidence that she was able to see close up (20 inches or less) and at distances (20 feet or more). D. 75 ¶ 6. First, Reynolds testified at her deposition that her vision at 20 inches or less was affected by her vision limitation as she needs to wear glasses and hold documents close when she reads. D. 75-4 at 24. She did not know whether close-up observations of patients would be affected with her corrected vision because she stated that she was never responsible for observing patients at that range. <u>Id.</u> at 25. She testified that her

---

contended that they had a legitimate business reason for discharge an employee), <u>aff'd in part, vacated in part</u>, 901 F.2d 186, 190-91 (1st Cir. 1990). Although not relying on such hearsay statements as substantive evidence of Reynolds' qualifications, the Court declines to strike the various other statements from witnesses' affidavits and depositions that Reynolds seeks to strike from the record. D. 72.

distance vision was affected by her poor vision but that she could recognize faces at a distance of 20 feet or more. Id.

Second, various eye doctors who examined Reynolds during the relevant time period proffered different opinions about her vision. Dr. John Loewenstein testified that in 2011, he "would have guessed that there would have been very little limitation of her close vision" and "[w]ithout a low vision aid, she would have difficulty" seeing at distances of 20 feet or more. D. 75-5 at 7. Dr. Carolyn Kloek testified that in 2011 there would "definitely be some limitation" of Reynolds' corrected near vision and distance vision, but on cross-examination was unable to say that it was "impossible" that Reynolds would be able to recognize faces at a distance or close up. D. 75-6 at 3. Dr. Linda Dagi testified that Reynolds would be able to read and fill out charts "if she held [them] really close" and that Reynolds is "definitely able to recognize faces at a reasonable distance" but at "15, 20 feet away . . . that would be harder." D. 75-7 at 4-5. Dr. Dagi testified that she did not know whether Reynolds was unable to recognize people at a 15 to 20 foot distance. Id. at 5.

Third, Reynolds received a 90-day performance review in which Ostrove gave her a "Meets Standards" rating for overall job performance. D. 75 ¶ 32; D. 75-9 at 8. The evaluation form included a list of the vision and hearing requirements of the Therapist position. D. 75-9 at 7. Reynolds characterizes this review as requiring the reviewer to "confirm that the employee is meeting all physical requirements, including vision and hearing," D. 74 at 7, but the review form itself simply includes a copy of the job description and asks the reviewer on the final page to rate the employee's "Overall Performance," D. 75-9 at 8. Reynolds received a "Needs Improvement" rating for the job responsibility of "insur[ing] a safe and therapeutic environment on the unit through observation monitoring, interacting and providing groups." Id. at 5. The standards

listed under this job responsibility include the ability to maintain a safe and therapeutic environment, to record patient observations appropriately on the checks board, to be diligent about following observation procedures and to monitor patients' behaviors and needs. Id. The only negative comment Reynolds received as to this job responsibility pertained to the checks board. Id.

Reynolds cites Calero-Cerezo v. U.S. Department of Justice, 355 F.3d 6 (1st Cir. 2004), in support of her argument that the 90-day performance evaluation entitles her to survive summary judgment. D. 74 at 16. In Calero-Cerezo, an attorney who suffered from depression and related behavior problems was terminated from her job. 355 F.3d at 18-19. The plaintiff argued that her termination violated the ADA and the Rehabilitation Act.[4] The district court granted summary judgment for the employer, but the First Circuit reversed. Id. at 26. In considering whether plaintiff was a qualified individual, the First Circuit noted that "whether a reasonable factfinder could conclude that [plaintiff], while suffering the powerful effects of her disability, still possessed the ability to function competently and productively in the workplace" was a close question. Id. at 22. The First Circuit relied upon the fact that the employer gave plaintiff an evaluation – less than one year before her termination and several months after her attack of depression began – "not merely of average, but of 'fully successful.'" Id. at 23. The First Circuit concluded that "despite some flaws and problems, the [employer] pronounced itself fully satisfied with [plaintiff's] level of performance even while she suffered from her major depression. . . . [T]his documentation alone entitles the plaintiff to consideration by a factfinder" of whether she was a qualified individual. Id. Certainly, the present case provides a closer question than Calero-Cerezo. Although she received an overall "Meets Standards" review, it

---

[4] The same standards apply to claims under the ADA and under the Rehabilitation Act. Oliveras–Sifre v. Puerto Rico Dep't of Health, 214 F.3d 23, 25 n.2 (1st Cir. 2000).

12

included a "Needs Improvement" rating for the relevant job duty of maintaining patient safety and monitoring patients, the very issue affected by her vision impairment. That is, the significance and meaning of this review as to the qualifications of Reynolds for her position is at least debatable and disputed by the parties.

Finally, after her termination, Reynolds was assigned to a different job at Butler – as a per diem Therapist in Butler's Partial Hospital Program – with an identical job description as the Therapist job from which she was terminated. D. 74 at 9. Reynolds contends that this reassignment suggests that she was capable of performing the job requirements of Therapist and that the reassignment reflects the Defendants' tacit agreement as to same. There is at least a dispute as to whether this reassignment required the same qualifications. One of Defendants' own employees, Bigelow, from Human Resources, testified that the written job description and evaluation forms for the two jobs were the same. D. 75-12 at 17-18. Reynolds herself, however, testified that the new job as a per diem Therapist in the Partial Hospital "wasn't the same role" as the Therapist job from which she had been discharged, D. 75-4 at 29, and Ostrove, the Director of Occupational Therapy, explained that the Partial Hospital Program is a different clinical unit with outpatients who are not actively suicidal, so a lower level of observation is necessary by the Therapists providing care in that program, D. 62-15 at 10. Given the conflicting testimony in the record, there is at least some dispute as to whether the Defendants' offer of the per diem Therapist assignment supports Reynolds' position that she was qualified for the Therapist position.

Although it may be that Defendants would prevail at trial as to whether Reynolds met the Therapist vision qualifications without accommodation, the Court cannot say that the record provides an undisputed record for resolving this matter in Defendants' favor at the summary

13

judgment stage. It is certainly undisputed that Reynolds made errors on the checks board. See D. 75 ¶ 26, D. 75-4 at 21. (Whether Reynolds' vision disability in this regard could have been reasonably accommodated is addressed below). The record as to the impact of her vision disability on other of her duties is disputed. Defendants introduced affidavits from Reynolds' co-workers in which they offer first-hand accounts of Reynolds misidentifying patients, failing to acknowledge and appearing to fail to recognize Butler staff and making errors on the checks board.[5] D. 62, Exhs. 6-11, 13. Judy Sheehan, Butler's Director of Nursing, reported that Reynolds did not acknowledge her and appeared not to recognize her on two occasions. D. 62-6 ¶¶ 10-11. Mental Health Worker Andrew Abrams stated that he observed Reynolds regularly misidentify patients and make errors with the checks board. D. 62-7 ¶¶ 5-6. Mental Health Worker Kathryn Greenfield reported that Reynolds did not recognize her from one shift to another, had difficulty identifying patients and telling Greenfield where they were, and made errors with the checks board. D. 62-8 ¶¶ 5-6, 9, 12. Greenfield stated that Reynolds confused two patients who both used canes. Id. ¶ 10. Mental Health Worker Raquel Silva reported that Reynolds regularly misidentified patients. D. 62-9 ¶ 5. For example, Silva stated that Reynolds would mistake patients for one another if they had similar dress or hairstyles. Id. Silva said that Reynolds would often need to stand uncomfortably close to recognize her and on one instance

---

[5] Reynolds moves to strike, in relevant part, the portions of these affidavits where witnesses state that Reynolds failed to acknowledge them, appeared not to recognize them, or had difficulty recognizing patients and identifying them to the witnesses. D. 72. Reynolds argues that these statements are inadmissible under Federal Rule of Evidence 701(a) because there "is no way the witnesses can testify what Reynolds was seeing or hearing." Id. at 2-3. The Court disagrees. Federal Rule of Evidence 701 limits lay witness testimony to opinions or inferences "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge." The witnesses in question here are not offering opinion testimony as to what Reynolds was seeing. Instead, the witnesses are reporting their personal observations of Reynolds' behaviors.

mistook her for a patient during a walk around the campus. Id. ¶¶ 10-13. Nurse Donahue stated that Reynolds misidentified a patient while Donahue was distributing medication and that Reynolds did not appear to recognize Donahue when the two would pass in the hallway. D. 62-10 ¶¶ 5, 8. Mental Health Worker Hannah Roosa stated that Reynolds seemed to have trouble recognizing her and on several occasions when Reynolds was on checks board duty, Reynolds either could not tell Roosa where a patient was or had a delayed reaction to Roosa's request. D. 62-11 ¶¶ 4, 9. Roosa gave a different account from Reynolds of the incident where an injured patient asked for a Band-Aid: according to Roosa, she and Reynolds were standing near each other in the bathroom doorway. From this position, Roosa could clearly see that the patient had a significant self-inflicted wound. Reynolds, viewing the incident from substantially the same position, thought the patient needed a Band-Aid. Id. ¶¶ 6-8. Roosa also reported that she gave Reynolds a ride home a few times, and Reynolds could not locate her street or recognize her surroundings, causing them to miss her street and circle back. Id. ¶ 11. Nurse Ben Candelaria reported that Reynolds often could not recognize him and, when he gave her a ride home, was unable to see street signs or recognize her surroundings well enough to give him directions. D. 62-13 ¶¶ 5, 7.

Reynolds disputes the substance of a few of these accounts, and where Reynolds has identified specific, admissible facts contradicting Defendants' witnesses, the Court has drawn all inferences in Reynolds' favor. In her affidavit, Reynolds contradicted Roosa's account of Reynolds' failure to locate her street or recognize her surroundings when Roosa gave Reynolds a ride home. D. 75-3 ¶ 34. Reynolds stated that she had just moved and that she alerted Roosa to her street before they passed it. Id. Of more relevance to her work performance, Reynolds disputes what happened during the incident where an injured patient asked for a Band-Aid.

According to Reynolds, the patient backed into a corner of the bathroom, covered her hand with her arm and told Reynolds she had cut herself. D. 75-4 at 17-18. Reynolds called for Mental Health Worker Hannah Roosa to get Nurse Katelyn Donahue, the nurse assigned to the patient, and then Reynolds responded to the patient. D. 75-1 at 18; D-75-4 at 17-18. As to the other incidents, Reynolds challenges the credibility of her co-workers because they were "very friendly with one another," "spen[t] time with one another outside of work" and never brought their concerns directly to Reynolds. D. 75-3 ¶¶ 14-15. Reynolds' counsel at oral argument also attacked the credibility of these accounts on the basis that Reynolds' co-workers were motivated by stereotypes against disabled people, Feb. 5, 2015 Hearing Tr. at 22:11-16, but there is no specific, admissible evidence to this effect in the record. Nevertheless, given the balancing of evidence that a factfinder must do to determine the upshot of the co-workers' interactions with Reynolds – i.e., whether they amounted to her being unqualified for the job – and that such balancing may turn on the credibility of these accounts, the record on this issue militates against summary judgment in Defendants' favor because "credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." Sensing v. Outback Steakhouse of Florida, LLC, 575 F.3d 145, 163 (1st Cir. 2009) (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000)).

Construing the factual record in the light most favorable to Reynolds, the Court cannot conclude that Defendants have met their burden of showing that they are entitled to summary judgment as a matter of undisputed material fact. There is a triable issue of fact as to whether Reynolds was qualified in terms of vision function for the Therapist position. Although her own testimony and that of her doctors identifies limitations to Reynolds' corrected close and distance vision, her 90-day performance review was relatively positive even as it expressly rated her

observation and monitoring skills as needing improvement. That area for improvement was based only on Reynolds' difficulty with the checks board for which, as discussed below, Reynolds sought reasonable accommodation from the Defendants. Given the dispute about this matter, she is entitled to have this dispute resolved by a jury. In considering and weighing this evidence, the jury may also consider whether the similarity or dissimilarity with the per diem Therapist position lends credence to the Defendants' position that she was not qualified for the Therapist position.

Although Reynolds cites to Sensing, D. 74 at 15 (citing Sensing, 575 F.3d at 163), which lends support to her argument that conflicting evidence as to her ability to perform the essential functions of the Therapist position precludes entry of summary judgment for Defendants on this record, there is much about the nature of her position that is closer to the staff worker in Amego. That is, at trial, Reynolds must show not only that she is capable of performing the essential functions of the job, but also that she can do so without endangering the safety of others. Amego, 110 F.3d at 144.

      b. Ability to Perform With Reasonable Accommodation

Reynolds bears the burden of proving that a "proposed accommodation would enable her to perform the essential functions of her job" and that, "at least on the face of things, [the accommodation] is feasible for the employer under the circumstances." Tobin v. Liberty Mut. Ins. Co., 553 F.3d 121, 136 (1st Cir. 2009) (quoting Reed v. LePage Bakeries, Inc., 244 F.3d 254, 259 (1st Cir. 2001)). Reynolds suggests several accommodations that would have permitted her to see as required to perform her job and which must be resolved at trial given the disputed issues of fact regarding same.

Reynolds argues that her vision limitations could have been accommodated with modifications to the checks board – either by Defendants changing the format of the checks board or removing Reynolds from checks board duty altogether. D. 74 at 14. It is undisputed that Reynolds made multiple requests to Defendants to modify the checks board to include bold lines or a grayscale to make it easier for her to see, D. 75-4 at 18, 23, and these changes were not made by the Defendants. Ostrove's response to this suggestion was positive, D. 75-4 at 23, but the changes were never implemented, id. at 21-22, even as this was the one area cited as needing improvement in Reynolds' 90-day performance evaluation. In her brief, Reynolds also argues that removal from checks board duties would have been a reasonable accommodation. D. 74 at 14. There is a dispute as to whether such adjustments to the checks board would have accommodated Reynolds' vision issues as to this job function and whether there were other reasonable accommodations (i.e., changing her position to a non-float position, compare D. 74 at 14 with D. 61 at 12) that would have done the same as to other of her job functions. While the creation of a new position is not required as a reasonable accommodation under the ADA, the record here establishes only that Ostrove was "monitoring" her staff to see if a non-float position might be available. D. 75-1 at 33; see Phelps v. Optima Health Inc., 251 F.3d 21, 27 (1st Cir. 2001) (affirming summary judgment for employer on issue of qualification where a patient care nurse asked to be reassigned to her previous job as a medication nurse but failed to show that the position still existed and was vacant). On this disputed record, if a jury determines that Reynolds could not perform the Therapist duties without reasonable accommodation, the jury must then determine whether Defendants could have reasonably accommodated Reynolds' vision impairment so she could perform her job duties.[6]

---

[6] Reynolds also argues that Defendants violated the ADA by failing to engage her in

## VI. Conclusion

For the foregoing reasons, the Court DENIES Defendants' motion for summary judgment, D. 60, and DENIES Plaintiff's motion to strike, D. 72.

**So Ordered.**

/s/ Denise J. Casper<br>United States District Judge

---

discussions regarding possible accommodations. D. 74 at 17-18. She argues that Defendants' failure to engage her in such an interactive process manifests a lack of good faith. Id. at 16. This claim refers to 29 C.F.R. § 1630.2(o)(3), which provides: "[t]o determine . . . appropriate reasonable accommodation it may be necessary for [an employer] to initiate an informal, interactive process with the individual with a disability . . . [to] identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." Given the ruling above, however, the Court need not resolve this matter at this juncture. That is, the issue of engagement as an interactive process as it bears upon Defendants' good faith will be for the jury to consider provided that Reynolds makes a showing that a reasonable accommodation could be made to allow her to perform the essential functions of her job.